BOOTH, Judge.
This cause is before us on appeal from the judgment of the Circuit Court for Franklin County upholding ad valorem tax assessments for the years 1978 and 1979 on tim-berlands owned by appellants. The lands in question are classified as agricultural under Section 193.461, Florida Statutes, and were appraised by appellees using the income approach (capitalization of net earnings to land) recommended by the Agricultural Guidelines of the Department of Revenue (Guidelines), employing the following formula:
_ (Yield[1] X Price [2]) - Costs [3] Value Capitalization Rate [4]
The numerator of the fraction determines the net income of a year’s production on the land which is then divided by the capitalization rate to give the assessed value of the land.
All parties agree that the income approach, and the formula used, are well suited to obtaining a fair assessment of timberland. It has been in use for more than a decade to value timberlands for tax purposes. Disagreement arises over two factors used in the formula, specifically the capitalization rate and the cost factor, as more recently affected by revision of the Guidelines.
Promulgation of the Guidelines to assist county property appraisers and the estab *707 lishment of standards of values are statutory duties of DOR.[5] Section 195.032, Florida Statutes, requires DOR establish standard measures of value to be used by property appraisers in all counties and provides, in part:[6]
The standard measures of value shall provide guidelines for the valuation of property and methods for property appraisers to employ in arriving at the just valuation of particular types of property consistent with ss. 193.011 and 193.461. The standard measures of value shall assist the property appraiser in the valuation of property and be deemed prima facie correct, but shall not be deemed to establish the just value of any property, (emphasis added)
Pursuant to the above statute, DOR promulgated the Guidelines and, in 1976, revised those Guidelines to call for the use of a five-year moving average rather than current taxable year figures in determining value of timberland. The Guidelines specify use of the five-year moving average to determine safe rate, risk rate and illiquidity rate, three variable factors which are added in the determination of the capitalization [CAP] rate.[7]
At issue in the instant case are (1) the property appraiser’s use of a five-year moving average to determine the safe rate and the illiquidity factor, and (2) the use of $1.75 per acre as the cost factor in the formula. The evidence showed that DOR supplied to appellee property appraiser both a six percent safe rate, determined using a five-year moving average, and the $1.75 per acre management cost factor.

The Safe Rate

The Guidelines define the “safe rate” as “the maximum rate which could be earned on a completely liquid, most nearly risk free investment.”[8] The property appraiser *708 found that, for both the years 1978 and 1979, the safe rate which could be returned on an investment was six percent. This determination was made using a moving average of market yields of “safe” securities for the five years preceding the taxable year. The trial court found that the five-year moving average was properly “considered” by the property appraiser, as were passbook savings yields of five to five and one-half percent, and that there was no abuse of discretion or violation of Section 192.042, Florida Statutes, in the assessment calculated with a six percent safe rate.
The testimony of a DOR expert and of the property appraiser was that the six percent figure was calculated by DOR personnel using a five-year moving average of market yields of treasury bills and various triple-A securities and that the six percent figure was supplied to the property appraiser. Using the similar securities but current figures for each of the taxable years in question, the plaintiffs’ expert obtained a safe rate of 7.71 percent for 1978 and 9.77 percent for 1979.[9]
Experts testifying for appellees defended the use of the five-year moving average in computing the safe rate on the grounds that it is designed to eliminate “fluctuation” which may occur due to changes in the economy. Mr. Nedeau, a DOR economist, conceded, however, that only by “accident” would the safe rate determined by use of the five-year moving average result in a value which would be the same as that determined as of January 1 of the taxable year. Appellees contend that the five-year moving average is an historical matter which the property appraiser is entitled to consider along with other factors.
We reject these justifications for use of the five-year moving average, first, because annual assessment contemplates fluctuations in value on an annual basis.[10] Averaging of prior years is contrary to the principle of the annual tax assessment required by the law of this State. As for the second justification, that the five-year moving average is merely an historical consideration, the nature of the Guidelines themselves, as well as the evidence regarding their actual use, shows that the Guidelines were intended to be, and are in fact, more than a matter for mere consideration by local property appraisers. Though not denominated rules, the Guidelines' are nonetheless intended to be, and are, widely relied upon, as they were in the instant case.[11]
*709 The record establishes that correct information needed for determination of the safe rate with current values is available for each taxable year. To the extent that the Guidelines recommend or require the use of the five-year moving average to determine the safe rate, they are contrary to the requirement that property be assessed as of January 1 of each year. Section 195.-042, Florida Statutes; Lanier v. Overstreet, 175 So.2d 521 (Fla.1965); Dade County Taxing Authority v. Cedars of Lebanon Hospital Corporation, Inc., 355 So.2d 1202 (Fla. 1978); Lake Worth Towers v. Gerstung, 262 So.2d 1 (Fla.1972); and Escambia Chemical Corporation v. Fisher, 277 So.2d 307 (Fla. 1st DCA 1973).
Appellants also challenge the appraiser’s illiquidity rate of .5 percent used in the computation of the CAP rate.[12] The illiquidity factor reflects the time it takes to convert the investment into cash and depends upon the availability of cash and purchasers for land. In years past, the appraiser had used a one percent illiquidity rate but inexplicably reduced it by half for the taxable years of 1978 and 1979. The result is to lower the CAP rate and raise the assessment. However, we are unable to find error, since the record does not disclose that the five-year moving average was actually used in the calculation of the illiquidity rate, and abuse of discretion has not been clearly shown.

Management Costs

Appellants also challenge the $1.75 forest management cost factor used in the evaluation formula, the same cost factor supplied by DOR to county tax assessors since 1974. It is unsupported by any competent evidence of present accuracy and is unrealistically low. The landowners’ expert testified, without contradiction, to cost figures actually incurred in 1978 and 1979 by appellants and to the higher average statewide costs for those taxable years.
The DOR has undertaken to supply local property appraisers with reliable data needed in making assessments but, although capable of supplying accurate information for this purpose, the DOR has failed in this instance to update the cost figure used since 1974. The evidence supplied by the appellants’ expert was the only competent, relevant evidence on this item adduced below.
Finally, we agree with appellees that, as correctly stated by the trial court, the determination of assessed value may properly involve the appraiser’s consideration of historical as well as projected values. The appraiser’s ultimate determination, however, must always be the value of the property as of the annual taxable date. We also agree with appellees that the appraiser exercises a degree of judgment in selecting which data he will consider and in determining the actual numerical values to be assigned to various factors in the formula for valuing agricultural lands. He may not, however, use obsolete, clearly erroneous values in the formula, nor may he compute the ultimate values to be assigned to the formula factors by averaging prior years.[13] *710 The specialized formula prescribed for valuing agricultural lands does not, by virtue of its artificial and speculative nature referred to by appellees, excuse the appraiser’s compliance with the legal requirements for tax assessments in this State.
Accordingly, the judgment below is reversed, the assessments in question set aside, and the cause remanded for proceedings in accordance herewith.[14]
THOMPSON, J., concurs.
ERVIN, J., concurs and dissents with opinion.

. Yield is annual growth increment of timberland expressed in cords per acre per year.

. Price is stumpage price expressed in value of timber products per cord.

. Cost is forest management cost associated with timber operations. These costs are divided into two types: annual recurring expenses and improvements to the land.

.Capitalization is a figure representing the relationship between net income to the land and the value of the land. Using the “summation method” recommended by the Guidelines, components of the capitalization rate include safe rate, risk rate, illiquidity rate and management rate, to which is added the county ad valorem millage, expressed as a percentage.

. Sections 195.002, 195.032, 195.062, Florida Statutes.

. Section 195.032, Florida Statutes, provides:
In furtherance of the requirement set out in s. 195.002, the Department of Revenue shall establish and promulgate standard measures of value not inconsistent with those standards provided by law, to be used by property appraisers in all counties, including taxing districts, to aid and assist them in arriving at assessments of all property. The standard measures of value shall provide guidelines for the valuation of property and methods for property appraisers to employ in arriving at the just valuation of particular types of property consistent with ss. 193.011 and 193.461. The standard measures of value shall assist the property appraiser in the valuation of property and be deemed prima facie correct, but shall not be deemed to establish' the just value of any property.

. The Guidelines, at page six, also appear to recommend the five-year moving average be used in all respects, viz:
In order to minimize the effect of the wide fluctuation of data used and to provide a measure of stability to the resulting values on agricultural lands, it is recognized that a number of years of historical data on cost and income should be considered. However, due to lack of historical data or lack of research on a particular technique, it is recommended by the Department that a simple five year (5) moving average be used until more data are available or further research can be accomplished to justify modification of the simple five year average concept.

.The DOR Guidelines, as amended in 1976, page 3, provide that, in determining the “safe rate,” “the property appraiser shall use the following guide” and sets out the following:
The selection of the safe rate is an attempt to find the maximum yield, risk-free, most liquid alternative investment to the operator. There are several investment opportunities which might be considered to determine the safe rate. Each has its limitations. The interest rate on passbook savings accounts is often suggested. These accounts have a maximum legal interest which is not subject to the influences of supply and demand. Certificates of Deposit pay better interest rates than passbook savings accounts because of a required length of time and money must remain on deposit. Thus, Certificates of Deposit should not be considered here. Corporate Aaa bonds pay a slightly higher yield because of a slightly higher element of risk in their ownership. They should not be considered here either. The market yield of thirteen-week U.S. Treasury Bills appears to have a minimum of limitations. There is no risk with these securities and they are as liquid as any other comparable investment opportunity. The only limitation is a rather high minimum denomination. A five-year moving average of the market yields of these securities as published in the Federal Reserve Bulletin, should provide a suitable safe rate.

. We note that the parties rely on the Guidelines but disagree as to interpretation on determining the safe rate. The Guidelines mention several investments but state “each has its limitations.” Thus, the Guidelines point out that passbook savings accounts have a fixed legal interest rate and are not subject to the influences of supply and demand. Though ambiguous, this statement is not an endorsement of passbook savings rates as determinative of the safe rate. On the other hand, the 13-week U.S. Treasury bills has the minimum of limitations and, say the Guidelines, “should provide a suitable safe rate.” (Guidelines at pp. 3-4)

. The use of the five-year moving average, rather than current taxable year values for factors in the CAP rate, serves, in inflationary times, to reduce the CAP rate and thereby increase the property assessment. Further, since the taxpayer is assessed on current inflated values determined in the numerator of the formula fraction, but not on current interest rates, the critical variable in the denominator, the balance and accuracy of the formula is seriously jeopardized.

.Mr. John James, the Property Appraiser of Franklin County, testified that the use of the five-year moving average was “the most asinine, stupid, ridiculous thing I have ever see [sic] in my life,” and further:
Q [Cross-examination, Mr. Kent] So there are other classes of property in Franklin County that you do not assess as of January first of each year?
A [Mr. James, Property Appraiser] Oh, no, sir, no, sir. Everything is assessed as of January first, except this, we have to use five-year averages, (emphasis added)
Under questioning by the court, however, the appraiser concluded his testimony as follows:
THE COURT: That is what you arrive at on the basis, but your assessment is what your appraisal is as of January first of each year?
THE WITNESS: Yes, sir.
THE COURT: And that is every piece of property that you assess?
THE WITNESS: Yes, sir.
THE COURT: All right.

. The Guidelines, at p. 4, defines the illiquidity rate as follows:
The illiquidity component is compensation for the length of time needed to sell the subject parcel on the open market. Using the money market to arrive at an illiquidity rate assumes supply and demand considerations are similar in the money and real estate markets. For instance, if three months is the assumed average marketing time for an average agricultural parcel in the state, the illi-quidity rate should and could be determined by the five year average difference in market yield between the twenty-six-week Treasury Bill and the thirteen-week Treasury Bill.

. Escambia Chemical Corporation v. Fisher, 277 So.2d 307, 308 (Fla. 1st DCA 1973):
The defendant tax assessor thus testified, in effect, that he did not evaluate the plaintiffs property for the year 1970 but, instead, took the valuation for 1966 and took into consideration “plus and minus for additions and withdrawals....” Such a valuation procedure has not been authorized by any statute enacted by the Florida Legislature. That procedures does not, in our opinion, meet the requirement that tax assessors must assess anew each year all taxable property.
Lowe v. Lee County Electrical Co-Operative, Inc., 367 So.2d 1114, 1117 (Fla. 2d DCA 1979):
*710 If the unit method was not an acceptable method for assessing the Co-Operative’s property, then the assessments must fall, because whatever discretion the property appraiser exercised was employed on the wrong premises.

. See, Cassady v. McKinney, 343 So.2d 955, 957 (Fla. 2d DCA 1977).